Good morning, Your Honors. May it please the Court, my name is Stephanie Bond. I represent the appellant James Essner in this case. I would like to reserve three minutes for rebuttal argument. There were five total issues that were asserted in Mr. Essner's brief. My intention today was to focus on two of those issues specifically. First of all, whether there was evidence to support a conviction based upon his defense of involuntary intoxication. And second, whether the government proved that his words constituted a true threat. He was convicted of threatening to assault or murder officers or employees of the United States, specifically 18 U.S.C. 115. More specifically, he was convicted of threatening to assault or murder U.S. pretrial services officer Mike Heimlich, who was his pretrial services officer at the time the incident happened. This case involves a voicemail that Mr. Essner left for Mr. Heimlich at Mr. Heimlich's work at the U.S. courthouse in Tucson, Arizona. Mr. Essner at trial asserted a defense of involuntary intoxication. Specifically, he claimed that at the time of the telephone call, he was at the hospital at Tucson Medical Center, and that he had been given four milligrams of morphine and other drugs that impaired his ability to understand or appreciate the wrongfulness of his conduct. Specifically, he stated that he was not legally responsible for his conduct based upon this morphine and other drugs. There were two different experts that testified. On behalf of the defense was Dr. Altshuler. The parties had previously stipulated that at 1229 p.m. on October 14, 2010, the date the voicemail was left, that Mr. Essner was given morphine by members of the Tucson medical staff in treatment of him. They had also given him other drugs that were also an issue in the case. Specifically, Dr. Altshuler had testified that the morphine that he was given is a narcotic, that it will and can impair a person's judgment, comprehension, and knowledge, and that in Dr. Altshuler's expert opinion, he would have still been under the influence of the morphine when he made the telephone call, which was made three and a half hours later from his hospital room at the Tucson Medical Center. But he did also say persons who actually saw the defendant were in a much better position to determine the impact than I am. Well, Judge, the only person who actually testified that he actually saw and interacted with the defendant I didn't ask that. I said, did he say that persons who actually saw the defendant were in a better position to determine the drug's impact? I do believe that was part of his testimony, yes. And in looking at that, we have to look to Dr. Gold, who testified on behalf of the government, who was a person who saw Mr. Essner virtually. He had estimated the time in which he saw him, but basically 25 to 15 minutes before the telephone call was made. 345. Correct. He had said he thought it was somewhere 345 to, I believe, 401, and the telephone call was made at 409 p.m. And Dr. Gold had agreed that morphine will stay in a person's system for up to seven hours, and he also agreed that Mr. Essner seemed very agitated and irritable when he saw him. Now, of course, the issue was, well, was this the morphine or not? And Dr. Gold couldn't explain that. Dr. Gold did not know whether or not. I thought his testimony was, what's my standard of review, Counselor? Judge, I believe your standard of review, and if I recall right from the briefs, I think that the government had disagreed, but I believed it was a de novo standard of review. Well, it might even be de novo, but at least review the evidence and the like most favorable to the prosecution, right? That is correct. So when I read Judge Gold's testimony, it seems to me that he testified he observed the defendant. He observed nothing to suggest he was delirious or confused. Instead, was cogent and communicative, not suffering unusual side effects due to the administration. Well, Judge. That's what he said. That is what he said, and he also said that the morphine can make some people irritable, and he felt that Mr. Essner was irritable at the time. But I guess, again, viewing the evidence and the like most favorable to the prosecution, I'm having a tough time. This evidence sufficient to sustain on a bench trial. We're in a bench trial here. I don't know who said we're going to have a bench trial in this situation, but it's a bench trial. I totally agree with you, Judge. And Lutke, and I don't know how to say his name because I'm from Idaho, L-U-E-D-T-K-E, Lutke. No adverse effects shortly after the administration. Then Libria says the same thing as Lutke. And then Altshuler says people who see him are in a better position than I am. And I'm to say, in the light most favorable to the prosecution, that there's no evidence to sustain this verdict? Well, Your Honor, the reason why I believe that you are, and you should say that, is because of the fact that they're saying that there was no adverse effects of the morphine. What we're saying is that morphine generally causes these problems. So they're looking at it like, is he having some kind of reaction to the morphine? Morphine in itself, any narcotic drug, is going to impair a person's ability. And short of a confession, what would be sufficient evidence? Well, I think a confession, yes, or the fact that they haven't been on morphine. Well, okay. But given that you have somebody who's had morphine administered, you're basically telling us, I think, that without a confession, it's not possible to convict. Is that the case? Well, Judge, I think in this kind of a situation where you have somebody who's making a threat over a telephone, yes. I mean, I think that morphine is something that impairs a person's ability to understand and appreciate the wrongfulness of their conduct. And that's basically what the government has to show, is that he did understand it. But morphine is a very powerful drug. Even Dr. Gold himself had said that 4 milligrams, which Mr. Esner was given, was a very large amount in his case. I mean, he was the one who said, you know, it's my standard practice, and I only give 1 to 2 milligrams. And that's why I reduced his level of morphine later that day after I saw him. So, I mean, Dr. Gold, the government's witness, says that 4 milligrams is a very high amount to be given to a person. But you're not willing to accept Dr. Gold's observations. I am willing to accept Dr. Gold's observations, in the sense that Dr. Gold said that Mr. Esner seemed very irritable, and that morphine will cause a person to become irritable. Is that all Dr. Gold said? No, that's not all what he said. And my problem here is that it seems to me that you've recognized that, and the witnesses have told us, that morphine has different effects, different people, different time, and so forth. But you've basically said, unless the defendant confesses, if morphine has been administered, there's no way to figure out that there wasn't diminished capacity, so defendant must win. That strikes me as a difficult position to defend. Well, Judge, I mean, and I guess that's probably the reason why he was found guilty is because it is a difficult position to defend. But I think the fact still remains that you've got somebody who you're saying has to sustain the intent and has to be able to appreciate what he's saying and appreciate the wrongfulness of his conduct. And when he's given a high amount of morphine, how can he possibly do that? I mean, it goes back to several of the cases that have been looked at before. Well, you don't mean how could he possibly do that, because you've acknowledged that morphine doesn't necessarily have that effect, but you've made it impossible under the standard you've espoused for the government to prove sufficiently, because if defendant doesn't confess, there's always the possibility it was the morphine, not the person. And I'm not sure why it is that the rational fact finder couldn't try to sort it out and decide in this case it was the person, not the morphine. Well, Judge, I guess had the government presented evidence that Mr. Essner has a history of doing this, had presented that at trial, had presented evidence that he had any type of additional problems, then they could have proven that. But, see, they didn't. They just proved that they just put that this was a one-time incident, that this happened. He had never called and threatened somebody was the evidence that was presented at trial. He had never called Mr. Heimlich. He hadn't had any problems with Mr. Heimlich. Mr. Heimlich had even said in his testimony there was no animosity, there was no anger, there was no issue that day whatsoever when they had seen each other earlier that day. So I think when you're looking at the context of this, it does go to show that the government didn't prove that it wasn't the morphine. I mean, I definitely think that the court needs to look at the context. I'm sure you told them. I'm sure that your client's lawyer, and I don't know whether it was you or not, but I'm sure somebody told this to the district judge who was trying the case, right? That's right. He had all the evidence in front of him. That's correct. He had this incident. And now, at that point, he wasn't giving any benefit to the prosecutor. The prosecutor had to prove his case. Now I'm giving every benefit of doubt to the prosecutor. I have no chance to even wade in. If the prosecutor needs the benefit, he gets it. And you're expecting me then to undo what the D.J. did. Well, Judge, I think the other issue that we had asserted was based upon the judge's rendition and his verdict, which I think does go into the effect of this. I don't believe that the judge did look at the burden of proof. I don't believe that he did hold Mr. Essner innocent until proven guilty. That's actually our first issue as to the fact that the judge said he based this. The extrinsic evidence? Correct. Yes. And I do believe that that ties into this. It isn't really extrinsic evidence in the first place, is it? Well, Judge. It was admitted, wasn't it? The tape itself was admitted, but there was no evidence admitted as to how a person's voice would be affected by morphine. So I believe that the judge was using extrinsic evidence in something that is not in a lay person's decision. I mean, other cases in the case of this case, it's not. As a finder of fact, isn't the finder of fact permitted to draw reasonable inferences from evidence? Well, yes, they are. But I don't believe that that's a reasonable inference. I see. That's something that calls for an expert opinion as to whether someone's voice would or would not be affected by morphine and to what extent they would be affected by morphine. And based upon that, I think the judge had already made up his decision and wasn't holding the government to their burden of proof even on the involuntary intoxication defense. I see that I've gone a little bit over. I apologize. I'll reserve the remaining. May it please the Court. I'm Bob Misko from the U.S. Attorney's Office in Tucson on behalf of the United States. In viewing the sufficiency of the evidence in this case, of course, the Court has to look at the evidence in the light most favorable to the government. And viewed in that light, the evidence was more than sufficient for the district judge to find the defendant guilty of the crime. Basically, the evidence at trial was that the defense expert said morphine could affect people. And it's an individualized effect. It doesn't really he didn't say it always affects people. He said it was an individualized effect and the people who dealt with the defendant would be in a better position to assess that. The person who primarily dealt with the defendant that day was Dr. Gold, who had actually seen the defendant on two prior occasions. Dr. Gold sees the defendant 15 minutes to a half hour before the threatening phone call. He … The defendant didn't have any concern about Dr. Gold. I mean, the part that puzzles me here is that the outburst in that voicemail seems aberrational compared to what else was happening. The defendant had some level of stress with the pretrial services officer because he had to take his urine test and he wasn't able to take his urine test and he feared the consequences of that and so forth. But I have a hard time understanding that outburst. I mean, the language, I haven't heard the tape, but the language used is unusual and seems to be aberrational as compared certainly to the second phone message. How is it that we should have confidence that in this case it wasn't the morphine? Okay. I think I've mushed lots of things together, but that's just kind of – I've looked at this and I've been kind of puzzled as to how else to explain the defendant's – the message that the defendant left. Okay. I would point to two facts that are in the record. One is it would be fair to say, I think, based on Mr. Heimlich's testimony, that he described a very up-and-down relationship with the defendant during the time of his pretrial supervision. As a matter of fact, he said in their first phone conversations, the defendant told him, I'm about to take the gloves off and everyone's going to know who James Estner is. I mean, the – and then Dr. Gold, who had also seen the defendant on two prior occasions before any of this happened, he described the defendant, based on those past encounters, as a truculent person who was impatient, angry, unreasonable and somewhat belligerent at times. So that's all of a pattern of what's going on here. And basically, Dr. Gold did say he didn't observe any variations in his different encounters with the defendant, both his prior encounters and the day of the incident. And he was in a position to evaluate what was going on that day. He was in the best position to evaluate. And he said the defendant on that day, about 15 minutes to a half hour before he made the threat, the defendant was cogent, communicative, lucid and rational. He had – the defendant had an angry attitude, but nothing to suggest he was delirious or confused. Based on those facts, the Court was certainly entitled to determine that the morphine was not the cause of the phone call. It was the defendant himself and not the morphine. And that was sufficient to prove the intent necessary to commit the crime. Unless the Court has any additional questions. Thank you, counsel. Thank you, Judge. Your Honors, this case was – the facts of this case were very strange in the sense that there was no issue going on with Mr. Heimlich and Mr. Essner that would prompt such a phone call. As the facts showed, there was not a level of stress that day. Mr. Essner had gone to court that morning, had spoken with Mr. Heimlich, had told Mr. Heimlich he was sick and was going to go to the hospital. Mr. Heimlich knew that Mr. Essner had a long history of heart problems and medical problems. Mr. Essner had said, I need to go to the hospital. And Mr. Heimlich had said that wasn't a problem. Go to the hospital. You don't have to do a urine drop today. That same issue was discussed just minutes later with Magistrate Guerin when he accepted a plea offer in his smuggling of alien cases, that that was not a problem. He didn't have to check in with Mr. Heimlich that day. He didn't have to do his urine drop. He could go to the hospital. Whenever he got out of the hospital, he was supposed to bring his paperwork and then check in with Mr. Heimlich. So there was no threat of Mr. Heimlich having Mr. Essner leave the hospital, as Mr. Essner's voicemail said. There was no threat that he was going to have to go do a urine test, because everybody that day had agreed there was going to be no urine test. Everybody agreed that he wasn't going to leave the hospital. Everybody agreed that he was going to stay in the hospital for as long as he needed to stay in the hospital. And when he got out, he was supposed to go then meet with Mr. Heimlich. So that's also why Mr. Heimlich had testified that the voicemail itself didn't make sense. First of all, Mr. Heimlich doesn't wear a sidearm that Mr. Essner could beat him over the head with and kill him. There was no antagonism, no animosity, no issue regarding Mr. Essner taking or not taking a urine test that day. Everybody had decided that that wasn't going to happen. So the voicemail itself didn't make any sense. Mr. Heimlich wasn't expecting to hear from Mr. Essner, as he stated in his testimony. He didn't expect Mr. Essner would call. He didn't think there was anything to talk about. When they had left earlier that day and parted, Mr. Heimlich wished Mr. Essner good luck, told him to contact him whenever he got out of the hospital. So there was absolutely no reason, first of all, for Mr. Essner to be upset. There was no antagonism. I would disagree with the characterization that he's about to take the gloves off and show him who he is had anything to do with pretrial services or anything. I believe that had more to do with defending his case on the alien smuggling and nothing to do with pretrial. And there was no evidence that it did have anything to do with pretrial. So I believe under that there was no reason, and nothing else could make sense, but that it was the morphine that caused Mr. Essner to leave the phone call that he did. Thank you. Thank you, counsel. The case is argued and will be submitted.
judges: Reinhardt, Clifton, Smith